IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN



LORENZO DEMOND KYLES,

Plaintiff,

v.

Case No. 4WD OC wi **C** **188**-bbc

LEHANAHA KRIZAN, RN;
JANE DOE, RN;
RENEE ANDERSON, RN;
R. STUVE, CO II;
J. BARKER, RN, HSM;
CAPTAIN LUNDMARK, HSU Liaison; and
JANE/JOHN DOE, RN/MD;

Defendants.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

---

## A. PARTIES

1. Plaintiff, Lorenzo D. Kyles, pro se, is located at Stanley Correctional Institution (SCI); 100 Corrections Drive; Stanley, Wisconsin 54768-6500.

2. Defendant Lehanaha Krizan, is currently employed as a nurse clinician at SCI; 100 Corrections Drive; Stanley, WI. 54768-6500.

3. Defendant Jane Doe, is currently employed as a nurse clinician at SCI; 100 Corrections Drive; Stanley, WI. 54768-6500.

4. Defendant Renee Anderson, is currently employed as a nurse clinician at SCI; 100 Corrections Drive; Stanley, WI. 54768-6500.

5. Defendant R. Stuve, is currently employed as a correctional officer II at SCI; 100 Corrections Drive; Stanley, WI. 54768-6500.

6. Defendant J. Barker, is currently employed as a Health service Manager at SCI; 100 Corrections Drive; Stanley, WI. 54768-6500.

7. Defendant Lundmark, is currently employed as a Supervisor and HSU Liaison at SCI; 100 Corrections Drive; Stanley, WI. 54768-6500.

8. Defendant Jane/John Doe is currently employed as a nurse or doctor at SCI; 100 Corrections Drive; Stanley, WI. 54768-6500.

9. Each Defendant is being sued in his and her individual and official capacity. At all times, in this Complaint each defendant acted under the color of state law.

## B. STATEMENT OF CLAIMS

1. On June 7, 2016 at SCI, Plaintiff Lorenzo Kyles was injured while playing basketball. He suffered a jamming injury, when the ball hit his dominant left hand thumb. His thumb instantly badly swelled and unable to use. He self-cared by icing, taking ibuprofen that he had prescribed for his bunions, and rested by wrapping the thumb with his own ace bandage.

-1-

2.  On June 20, when his own care did not improve his condition. Kyles submitted a Health Service Request (HSR) asking to be seen. In this request, he asked for his thumb to be examined  for a possible fracture, explained his joint is still swollen despite the injury occurring on June 7, and that now his thumb is hard to bend at times. See, **Exhibit (Ex) A**, HSR of Kyles (6/20/2016).

3.  On June 22, Kyles was seen by Defendant Nurse Krizan who he asked to be examined by a doctor for a possible fracture. Krizan informed him a doctor was not available at that time. Kyles explained how and when he jammed his thumb. Kyles also expressed that he have been icing, taking ibuprofen, and applied an ace bandage. Kyles explained that the pain is aching and constant which is keeping him from sleeping and because his grip has weakened, he have been relying on his roommate for help. See, **Ex. B,** Progress Notes of Krizan (6/22/2016).

4.  Krizan briefly paged the Nursing Protocol Manual and sought Nurse Jane Doe for assistance. Krizan explained to Jane Doe everything Kyles told her. Krizan and Jane Doe noticed slight swelling around his joint, Krizan touched the joint and Kyles winced in pain. Kyles told both nurses that this is the most painful spot for the last couple weeks. Jane Doe offered ice, ibuprofen, and suggested a minor thumb sprain that needed time to heal.

5.  When Jane Doe left the room. Krizan told Kyles his thumb sprain will need at least two months to heal. Krizan said to continue to use ice, provided ibuprofen, and wrapped his thumb/hand with an ace bandage. While Krizan was wrapping his thumb, Kyles said "I tried this already and my pain didn't improve." Krizan replied, "your thumb need time to heal." Kyles asked whether his thumb was fractured? Krizan said it was not because he could move it. Krizan did not provide a thumb splint and contrary to her notes, she did not tell Kyles to submit a HSR as needed. **Id.**

6.  Because Krizan and Jane Doe did nothing to relieve Kyles pain except offer the same ineffective plan of care (that had not helped him up to that point) for no better reason than concluding he could endure the aching and constant pain until he submit another HSR. Krizan and Jane Doe knew or recklessly failed to know the obvious that Kyles symptoms warranted referral to a doctor to determine the extent and cause of his constant pain to his two-week-old thumb injury.

7.  Based on Krizan and Jane Doe failures. Kyles seeks damages and compensation from both nurses for delaying necessary Left Thumb Radial Collateral Ligament repair Surgery that caused unnecessary prolonged pain, emotional distress, permanent disfigurement, and permanent lost of some range of motion at the MCP joint.

8.  On August 9,2016, Kyles submitted a Medication Refill Request for ibuprofen to relieve the ongoing thumb pain. The next day, his request was returned indicating "No Current Order." **Ex. C**, Medication Refill Request of Kyles (8/19/2016).

9.  On August 14, completely without ibuprofen, Kyles submitted another HSR. In this request, he explained the ibuprofen was issued for two-months. In response, he was told his ibuprofen was for one-month 6/22/16 through

7/22/16 and informed that if he needed to be seen again, resubmit a HSR indicating sick call is needed. **Ex. D**, HSR of Kyles (8/14/2016).

10. On August 16, Kyles submitted another HSR asking to be seen for ongoing thumb injury. In this request, he asked to be re-examined for a possible fracture. He explained that his left thumb look different than the right thumb. Kyles also requested an x-ray. **Ex. E**, HSR of Kyles (8/16/2016).

11. On August 18, faced with Kyles complaining of ongoing thumb pain, lack of ibuprofen, asking why his injured left thumb look different from the normal right thumb, and adamantly asking to be seen by a doctor for x-rays. **Ex. B**, Progress Notes of Anderson (8/18/2016).

12. Defendant Nurse Anderson assessed musculoskeletal discomfort, reviewed anatomy pictures, the nursing protocol manual for symptom review, and based on Kyles unyielding request for a doctor to determine the cause of his ongoing pain. Anderson referred him to a doctor, yet refused to issue ibuprofen, telling Kyles he had to wait to see the doctor because she was aggravated due to Kyles continuous request for a doctor. **Id.**

13. Because Anderson had knowledge of Kyles painful discomfort and the authority to issue ibuprofen, yet failed to provide ibuprofen for no better reason than being upset with Kyles persisted request for a doctor for x-rays. Kyles seeks damages and compensation from Anderson for prolonging his thumb pain.

14. On August 31,2016, Dr. Joan Hannula seen Kyles for evaluation of his left thumb pain. Kyles explained his ongoing pain, and how/when the thumb jamming injury occurred. Dr. Hannula noted "minimal tenderness around the Metacarpophalageal (MCP) joint." Dr. Hannula indicated Kyles was injury was likely a thumb sprain that needed more time for his ligaments to heal but submitted a referral for x-rays. Dr. Hannula issued ibuprofen for the pain that Defendant Anderson failed to provide. Dr. Hannula told him there will be a follow-up after x-rays. **Ex. F**, Progress Notes of Hannula (8/31/2016).

15. On September 6, an x-ray was taken of Kyles left thumb. The radiologist reported, "Results: Left thumb shows no fracture or dislocation. There is soft tissue swelling." "Conclusion: Soft tissue swelling without fracture. Cannot rule out slight subluxation at the MCP joint. Advise follow-up if there are persisting symptoms." **Ex. G**, Report of Radiologist (9/13/2016).

16. The next day, September 7, Dr. Hannula had Kyles called to HSU to discuss the x-ray results. Dr. hannula explained the persistent pain in the MCP was caused by subluxation where the joint improperly healed. Dr. Hannula showed Kyles the x-ray and discussed the joint was more than "slightly subluxation" contrary to the radiologist report. Dr. Hannula informed Kyles there may not be nothing done based on the fact his joint healed improperly. Dr. Hannula discussed Kyles may need surgery, so she referred him to an hand surgeon. **Ex. F**, Progress Notes of Hannula (9/7/2016).

17. On September 8, after learning the extent of his thumb pain. Kyles filed a grievance complaining of SCI Medical Personnel (Nurses Krizan, Jane Doe, and Anderson) deficient care caused his left thumb to improperly heal, continued pain and suffering and limited mobility. **Ex. H**, Grievance of Kyles (9/8/2016) and Appeals.

-3-

18. On September 9,2016, Kyles was brought to Marshfield Clinic where he was seen by Dr. Edward P. Hayes. Dr. Hayes reported: "The patient is a 37-year-old left hand dominant incarcerated man who had a jamming injury to his left thumb while playing basketball in June 2016. This has not been treated. He has significant pain and weakness of this thumb. This interferes with daily activities and will bother him with sleep." **Ex. I,** Report of Dr. Hayes (9/9/2016).

19. Dr. Hayes determined that Kyles had an "obvious deformity, deviating in an ulnar direction at the MCP joint," "he is tender at this joint," and "has significant laxity of the radial collateral ligament complex at the left thumb MCP joint." Dr. Hayes diagnosed Kyles with a 3-month-old radial collateral ligament injury. **Id.**

20. Dr. Hayes presented two options. Kyles could undergo surgery or he could live with chronic pain which will get worse over time. Kyles opted for surgery based on the fact he did not want to live with chronic pain to his dominant left hand. He said as a trade-off, Kyles will loss some motion.

21. Next, Dr. Hayes asked what took Kyles so long to have necessary treatment and were he provided a thumb splint? Kyles said, he told SCI medical staff in June of his aching and constant pain at the joint, and that medical staff only provided an ace bandage. Dr. Hayes stated, "you needed surgery in June to repair the ligaments."

22. On September 14, (5-days-later), Kyles returned to Marshfield Clinic for surgery. Dr. Hayes provided a nerve block, anesthesia, and performed left thumb radial collateral ligament repair surgery. He placed Kyles in a sling to aid, prescribed pain medication (Vicodin), and scheduled Kyles to return in 10-14 days for suture removal.

23. After surgery and returning to SCI, Kyles was told that he was prescribed to take one or two tablets of Vicodin every four hours as needed. He was asked if he needed some tablets. At that time, Kyles requested one pill. **Ex. J,** Progress Notes of Unknown Nurse (9/14/2016).

24. The next day, September 15, around 3:30am Kyles awoke with serve pain. He pushed the call button in his room. An Officer asked what was his emergency? Kyles told the officer that he was in serve pain and he needed his pain pills. Around 4:00am, Kyles was escorted to HSU where he took two pills.

25. Later that morning, September 15, around 9:30am, Kyles was seen at HSU for a post-surgery follow-up. Kyles informed the nurse of his early morning serve pain and waiting to be escorted to HSU.

26. The nurse noted acute pain and consulted with Dr. Hannula who changed his medication from every four hours to every six hours as needed. The nurse told Kyles there will be a follow-up in the morning and there shouldn't be a problem with relieving the pain in the early morning hours. **Ex. K,** Progress Notes of Unknown nurse (9/15/2016).

27. The next morning, September 16, Kyles went to HSU for his morning housing unit medication call. Defendant CO II Stuve provided Kyles with his two pain pills without incident.

28. Later around 9:00am, Kyles was seen at HSU for post surgery status check. This nurse noted that Kyles complained of throbbing to his left thumb and noticed "mild swelling" in the exposed fingers. Kyles informed the nurse that his pills were helping with the pain and throbbing. Kyles told the nurse his next dose is at the noon medication call. Kyles then requested treatment for constipation which he was provided stool softener. The nurse told Kyles to alert HSU of any concerns as needed regarding his constipation. **Ex. K**, Progress Notes of Unknown nurse (9/16/2016).

29. At Kyles' noon housing unit medication call. He and Clarence Givens #104205 went to HSU. Kyles expressed to Mr. Givens that his thumb was badly throbbing and he needed his pain pills. When they arrived at HSU, Mr. Givens helped him with getting a cup of water because Kyles arm in a sling and left hand wrapped.

30. Because Mr. Givens knew Kyles was in pain and other inmates did as well based on Kyles informing them. They allowed Kyles to skip in the medication line, so he could take his pain pills.

31. When Kyles approached the window to get his pain pills. Defendant CO II Stuve told Kyles he was early and to come back after count cleared. Kyles asked to wait, telling Stuve he was in pain and that he had surgery two-days ago.

32. Kyles showed Stuve his hand wrapped and his arm in a sling. Kyles asked "can I wait because I'm in pain."

33. Defendant Stuve directed him to leave and come back after count cleared. Because Kyles did not want to get a conduct report, he returned to his housing unit.

34. After returning to his room around 11:20am, Kyles took two-ibuprofens in hope to reduce the throbbing and pain to his fingers and thumb.

35. When Mr. Givens returned from HSU, he stopped by Kyles room because he witness the whole incident with Stuve and knew Kyles in pain. Mr. Givens asked if he needed anything? Kyles requested some ice and told Mr. Givens his fingers and thumb badly throbbing with pain.

36. Around 12:25pm when Noon Standing Count came. The ice and ibuprofens were not working, his pain got worse. So he stood by his door with his coat on waiting for count to clear. When count cleared around 1:00pm, Kyles rushed to HSU to take his pain pills.

37. Arriving at HSU, Kyles requested two pain pills from Stuve. Before Stuve gave him the pills. He looked at the clock and said he guess Kyles could get his medication now. Kyles said, "Stop playing I'm hurting". Stuve said "your meds. say every six hours."

38. Thereof, Kyles filed a grievance against Stuve for failing to provide him with prescribed pain medication to alleviate his pain for almost two hours. This grievance was not accepted. He was instructed to contact HSU Manager. **Ex. L**, Grievance of Kyles (9/16/2016) and Response.

39. On September 18, Kyles submitted a medication refill request for Vicodin because for some apparent reason there were no more after that morning medication call for his housing unit. **Ex. M**, Medication Refill Request of Kyles (9/18/2016).

40. On September 20, Kyles contacted Defendant HSM, Barker, telling her of CO II Stuve's refusal to provide pain pills, when he knew Kyles was in pain from a recent surgery. **Ex. N**, Informal Request to Barker (9/20/2016).

41. On September 21, Kyles went to HSU around 1:00pm to take his pain pills because he was still under Stuve's belief that he had to wait every six hours to relieve his pain.

42. CO II Cypher had Kyles to talk with medical staff because he seen a problem with Kyles' medication chart. **Ex. O**, Medication/Treatment Record of Kyles (9/2016).

43. Kyles relied on nurse Krizan that the possible dispute were he submitted refill request a few days ago because there were no more medication on his card. Further Kyles told Krizan that CO II Stuve refused to give him Vicodin to relieve his pain because he was within the six hour window. **Id.**

44. Krizan consulted with Dr. Hannula regarding his pain medication. When Krizan returned, she told Kyles that his prescription will be modified so he wouldn't have an issue with alleviating his pain. **Ex. P**, Prescriber's Orders of Dr. Hannula and Nurse Krizan (9/21/2016).

45. Krizan further told Kyles because your medication is as needed, that officer should have alerted medical staff before turning him away in pain.

46. Thereafter, Kyles requested one pill from CO II Cypher and returned to his housing unit.

47. On September 27, Kyles returned to Marshfield Clinic. At this appointment, Dr. Hayes had the wrapping and sutures removed, and a cast placed on Kyles thumb.

48. Dr. Hayes x-rayed and discussed the surgery by showing him the x-ray of the hardware insertion and the anchor placed on Kyles joint. Dr. Hayes drew the ligament up to the anchor and explained the anchor is permanent but the hardware will be removed. He then scheduled Kyles to return in 3-weeks. **Ex. Q**, Kyles' x-ray of left thumb by Dr. Hayes (9/27/2016).

49. When HSM, Barker failed to respond to Kyles need for help. On September 29 he filed another grievance complaining of CO II Stuve failure to refer him to medical personnel before denying him pain medication was an interference with prescribed treatment. This grievance wasn't accepted because was instructed to contact Defendant Capt. Lundmark. **Ex. R**, Grievance of Kyles (9/29/2016) and Response.

50. On October 1,2016 Kyles contacted Defendant Lundmark regarding CO II Stuve denial of pain medication when he knew Kyles was in pain and recently had surgery. Kyles also stated that he contacted Barker regarding the same but she did not intervene. **Ex. S**, Informal request to Lundmark (10/1/2016).

51. On October 13, he filed another grievance, based on CO II Stuve failure to refer him to medical staff before denying pain medication on 9/16/2016. In this grievance he asserted Good Cause existed because he was instructed to follow the chain of commend. Kyles attached his requests sent to Barker and Lundmark and stated they did not respond to his call for help. **Ex. T,** Grievance of Kyles (10/13/2016) and Appeals.

52. Because Defendant Stuve failed to refer Kyles to medical personnel, when he knew Kyles was in pain from a two-day-old surgery for no better reason than he had to wait until the sixth hour to alleviate his pain, was an interference with prescribed treatment by Dr. Hayes and Dr. Hannula. Kyles seeks damages and compensation from Stuve for disregarding Kyles' pain and suffering.

53. When Kyles' informal requests to resolve Stuve' failures went unanswered by Defendants Barker and Lundmark. They failed to exercise their authority to intervene on Kyles behalf to rectify Stuve's arbitrary conduct when he denied and delayed Kyles' prescribed medical treatment. Kyles seeks damages and compensation from Barker and Lundmark for turning a blind eye to his pain and suffering.

54. On October 17,2016 Kyles returned to Marshfield Clinic. At this appointment, Dr. Hayes had a second cast placed on Kyles thumb/wrist. Dr. Hayes scheduled him to return in 2-3 weeks for hardware removal surgery.

55. On November 23, Kyles returned to Marshfield Clinic for hardware removal surgery. Dr. Hayes provided a local anesthesia and performed the surgery. Dr. Hayes prescribed Tylenol #3 and scheduled Kyles to return within two weeks for hand therapy. **Ex. U,** Prescriber's Orders of Dr. Hannula and Nurse Krizan note (11/23/2016).

56. On December 5,2016 Kyles returned to Marshfield Clinic. At this appointment he was seen by Physician, Alexis Berg and Physical Therapist, Sara Meyer. Dr. Meyer measured Kyles wrist and thumb. She noted lost of density in both. Kyles asked was the density lost caused by the second cast left on to long? Dr. Meyer said presumably so.

57. Dr. Meyer then fitted him with a removable thumb splint. She instructed Kyles to wear full time except for bathing and performing Range of Motion (ROM) exercises. Dr. Meyer explained that Kyles will work with a SCI Physical Therapist to improve ROM. Dr. Meyer scheduled a follow-up with Dr. Hayes in 3-weeks. **Ex. V,** Off-Site Service Request of Dr. Meyer (12/5/2016).

58. After returning to SCI, Krizan noted and discussed with Kyles, the recommendation for physical therapy. Krizan flagged his medical file for the doctor. Krizan told Kyles, he should start this week or next week and informed Kyles to watch for his name on the appointment schedule. **Ex. W,** Progress Notes of Krizan (12/5/2016).

59. The same day, December 5, Defendant Jane/John Doe noted: "PT for finger exercises at SCI". **Ex. X,** Prescriber's Orders of Jane/John Doe (12/5/16).

60. On December 13, Kyles submitted a request to Barker and Lundmark hoping

they would intervene in the delay in receiving physical therapy at SCI. **Ex. Y**, Informal Request to Barker and Lundmark (12/13/2016).

61. On December 16, Kyles filed a grievance regarding SCI Medical Staff continuous delay in necessary medical care/treatment. In this grievance he requested an appointment for physical therapy at SCI and the immediate cease of delaying his medical care/treatment for no medical reason. **Ex. Z**, Grievance of Kyles (12/16/2016) and Appeals.

62. On December 22,2016 Kyles returned to Marshfield Clinic for his follow-up. Dr. Hayes noticed stiffness and asked whether PT at SCI were helping with the ROM. In response, Kyles said that SCI have not provided PT yet, he contacted the HSU Manager and the HSU Liaison, and filed a grievance last week.

63. Dr. Hayes instructed Kyles to use a tennis ball or a pair of socks, and told Kyles he will submit another referral for PT. **Ex. AA**, Report of Dr. Hayes (12/22/2016).

64. In Dr. Hayes report he stated the following: "The patient is a 37-year-old gentleman who had hardware removal from his left thumb on 11/23/2016." "He had a radial collateral ligament delayed repair on 9/14/2016." "I did remind the patient that there will always be some degree of limited motion of this operative joint, and that is the price we pay to improve the stability of the joint." **Id.**

65. After returning to SCI from that follow-up appointment. Kyles expressed Dr. Hayes recommendation to start PT, a pending grievance asking for a PT appointment at SCI, and told the nurse PT was recommended on December 5.

66. The nurse consulted a doctor and returned telling Kyles PT will start next week. The nurse then flagged, his medical file for a provider to review. **Ex. W**, Progress Notes of Unknown nurse (12/22/2016).

67. On January 7,2017 (33-days-later) Kyles PT began per Barker intervening based on Kyles' informal request of 12/13/2016 and presumably his grievance of 12/16/2016. **Ex. BB**, Memo from Barker to Kyles (1/4/2017).

68. This PT appointment was an evaluation where Physical Therapist, Jered Kuehn examined Kyles grip and pinch which were noted as being very weak. Also it was noted that Kyles were approved for six sessions. **Ex. CC**, Physical Therapy Initial Evaluation (1/7/2017).

69. Further at this evaluation, Dr. Kuehn discussed his similar thumb injury in the past, informing Kyles splinting would have been more appropriate, and if he would have seen him in June 2016, he would have provided a thumb splint to promote proper healing.

70. On January 12, at his first PT session. Kyles complained of morning stiffness and pain. Dr. Kuehn showed him a more agressive exercise for the lost of flexion in the non-operative first left thumb jont. **Ex. DD**, Physical Therapy Progress Notes (1/12/2017 through 1/26/2017).

71. On January 19, at the second PT session. Dr. Kuehn noticed small improvement but wished he would seen Kyles in December 2016 for a better result. Dr. Kuehn said that Kyles will have stiffness at the MCP joint and

that this was the best he could do to regain some flexion in the non-operative first thumb joint.

72. On January 20,2017 Kyles submitted a HSR, asking to be examined for stiffness and pain to his ongoing thumb condition post-surgery. Kyles request an x-ray to rule out inflammation. In response, Dr. Hannula stated: "Mr. Kyles an x-ray does not reveal inflammation." "Continue physical therapy." "Remember stiffness is common after surgery as is some limitation with range of motion." **Ex. EE,** HSR of Kyles (1/20/2017).

73. On January 26, at the third PT session. Dr. Kuehn expressed the flexion at the non-operative first thumb joint, will not be the same as Kyles 90° right thumb joint anymore. Dr. Kuehn discussed the ROM at the MCP joint improvement. Dr. Kuehn then discharged Kyles from the program, informing him to keep exercising his thumb. **Ex. CC and DD.**

74. Because Jane/John Doe knew "PT for finger exercises at SCI" were needed. His/Her failure to flag Kyles chart so a PT appointment could be timely scheduled, caused Kyles to loss some flexion at the non-operative first joint of the left thumb. Kyles seeks damages and compensation from Jane/John Doe for permanent disfigurement to his thumb.

75. Relevant to the claims of this Complaint as to medical protocols, Kyles submitted two HSRs'.

76. On December 6,2016 Kyles submitted a HSR asking: "What does the Nursing Manual Protocol advise for thumb jamming injury at the MCP joint?" Nurse R. Anderson stated: "Recommend Protect, Rest, Ice, Compression, Elevation for any musculoskeletal injury." "Referral to provider as needed." **Ex. FF,** HSR of Kyles (misdated 10/6/2016).

77. Further, on December 12,2016 Kyles submitted another HSR asking: "What does the Nursing Protocol Manual advise regarding how to PROTECT a thumb injury at the MCP joint? Nurse R. Anderson stated: "Protect-Ace wrap applied-This is a general protocol for musculoskeletal injuries." **Ex. GG,** HSR of Kyles (12/12/2016).

78. From June 2016 through December 2016 Kyles relied on his roommate Mr. August White #480525 for assistance with daily living. **Ex. HH,** Declaration of August White #480525 (2/8/2017).

79. Because Mr. Clarence Givens #104205 has personal information. He voluntarily submitted a declaration on Kyles' behalf regarding his view of Kyles pain when he was denied pain medication on September 16,2016 by CO II, Stuve. **Ex. II,** Declaration of Clarence Givens #104205 (2/8/2017).

80. All the facts listed above were taken from Kyles medical file, nurses treating him including doctors notes/reports, and Kyles' personal knowledge of these matters along with declarations of others.

81. Research was done by Kyles and family members, and examination by treating physician Dr. Hayes, who all discovered that Kyles condition with left thumb pain was caused by no treatment to his Radial Collateral Ligament injury for nearly three months before delayed surgical intervention.

-9-

82. Kyles is a layman, that has very limited knowledge in the science of law. Thus meaning he is heavily depending on the aid of whatever jailhouse lawyer he can find; including the one who prepared this Complaint.

83. Kyles obtained information from several sources describing the cause, symptoms, and appropriate treatment for thumb sprains with completely torn ligaments at the MCP joint.

84. Dorland's Medical Dictionary defines a sprain as a joint injury in which some of the fibers of a supporting ligament are ruptured but the continuity of the ligaments remain intact.

85. Stedman's Medical Dictionary defines a sprain as an injury to a joint, with possible rupture of some of the ligaments or tendons, but without dislocation or fracture.

86. The Medical Dictionary (http://medical-dictionary.thefreedictionary.com/ Dislocations+and+Subluxation visit 11/1/2016), defines dislocations and subluxations. "In medicine, the term dislocation and subluxation refer to the displacement of bones that form a joint." "These conditions affecting the joint most often result from trauma that causes adjoining bones to no longer align with each other." "A partial or incomplete dislocation is called a subluxation."

87. The Merck Manual of Medical Information 2nd Edition, Common Hand Injuries, p.401. GAMEKEEPER'S THUMB is a rupture of the ligament on the palm side of the thumb, which is responsible for pinching movements. It usually results from a fall that jams the thumb backward onto a hard surface. Treatment usually consists of a splint, but surgery is sometimes necessary. **Ex. JJ**, The Merck Manual of Medical Info., 2nd Ed.

88. Further in the Merck Manual, p.402. "When a ligament is ruptured, bones can move out of position, resulting in a dislocated joint." "X-rays may be needed to determine whether the joint is unstable and to detect fractures." **Id.**

89. Additional, "Often an untreated injury can result in a permanent deformity of the hand. Therefore, an injured hand should be immobilized so that it can heal normally. A bandage, splint, or cast may be used, depending on the injury. Surgery is sometimes necessary if bones are out of position or a joint is unstable. Hand exercises are begun as soon as possible to prevent loss of function." **Id.**

90. The American Medical Association-Complete Medical Encyclopedia, SKIER'S THUMB, p.1126. Skier's thumb results in instability of the thumb and loss of function. There may be pain and swelling in the area. The injury is also known as "Gamekeeper's Thumb". **Ex. KK**, The AMA-Complete Medical Encyclopedia.

91. Skier's Thumb is diagnosed by physical examination and possibly an x-ray to rule out fractures. X-rays may indicate a complete rupture of the ligament. If the thumb joint is sufficiently stable, a thumb is cast or brace may be worn for 3 to 6 weeks to immobilize the joint and allow healing. If the ligament is completely ruptured, surgery is usually necessary to reconnect the torn ends of the ligament. **Id.**

92. In the Gale Encyclopedia of Medicine 2, p.3147-48, describes the causes and diagnosis of sprains; such as there are three grades of sprains. Grade One sprains are mild injuries where there is no tearing of the ligament and are self-diagnosed. Grade Two sprains are caused by a partial tear in the ligament. Grade Three sprains are caused by complete tearing of the ligament. Both Grade Two and Three sprains are often seen by a physician, who x-rays the area to differentiate between a sprain and a fracture.

93. Furthermore, Grade One sprains are treated at home with Rest,Ice,Compression, and Elevation also known as (RICE). Whereas, Grade Two and Three sprains are treated with immobilization, cast for several weeks to see if the sprain heals. Also pain medication is prescribed and surgery may be necessary to relieve pain and restore function. Athletic people under 40 are most likely candidates for surgery, especially with Grade Three sprains. Lastly, for complete healing, physical therapy usually will follow surgery.

94. In the Medical Surgical Nursing: Critical Thinking in Client Care, p.1581, Nursing Care of Clients with Musculoskeletal Trauma it states: "If the dominant hand is injured, the client will require assistance in performing activities of daily living (ADLs)".

95. Medical Evidence from The Hand Center of Western Massachusetts has several sections that describe Thumb Sprains and how they are treated by Orthopedic Specialists (www.handctr.com/thumb-sprains visit 11/1/2016). Ex. LL, The Hand Center of Western MA.

96. For instance, a thumb sprain is an injury to a ligament. The most common thumb sprain involves the collateral ligaments of the MCP joint. These types of injuries are common in sports where the thumb is jammed into another player, the ground, or the ball. Characteristic signs include pain, swelling and bruising around the MCP joint of the thumb. The patient will often manifest a weakened ability to grasp objects or perform such tasks as tying shoes and tearing a piece of paper. Other complaints include intense pain experienced upon catching the thumb on an object, such as when reaching into a pants pocket. Id.

97. In another section, HOW ARE THUMB SPRAINS TREATED? It states:: "X-rays are usually taken to make sure the bones of the thumb and hand are not fractured." "Sometimes "stress" x-rays are also used." "Your doctor will then examine the thumb to determine whether the ligament is torn." "If the ligament is partially torn, it is usually treated in a cast or splint." "Radial collateral ligament injuries are frequently treated this way as well." "Complete ulnar collateral tears are most commonly treated with surgery to repair the ligament." Id.

98. Furthermore, CHRONIC INJURIES. The term "chronic" refers to an old injury of greater than one or two months duration. In this case the joint may be unstable with symptoms of pain, especially with pinching. The joint may feel loose and strength may be decreased. These injuries may be treated by reconstruction of the ligament, or joint fusion if arthritis is present. Untreated tears can cause disabling instability of the hand, since the ulnar collateral ligament stabilizes the first MCP joint. Id.

99. Next section, WHAT HAPPENS AND WHAT SHOULD I EXPECT AFTER SURGERY? "After the cast is removed, the pin that holds your joint in place is typically

removed in the office." "You then go to hand therapy and are fitted for removable splint that is very similar in size and shape to your cast." "however you can remove this splint for exercises and range of motion." "Failure to wear a cast, and then splint and deciding not to go to therapy can limit or compromise your result." "In general some loss of motion of the thumb occurs but the goal is to have a stable thumb joint for activity." Id.

100. Finally, in another section from the Hand Center of Western MA., RADIAL COLLATERAL LIGAMENT INJURIES OF THE THUMB. ABSTRACT- "Radial collateral ligament (RCL) injuries of the thumb are relatively common although they are less common than ulnar collateral ligament injuries, which make up 10% to 42% of collateral ligament injuries of the thumb." "The RCL is especially important for pinch movements and for movements of depression." "Complete disruption of the RCL can result in both static and dynamic instability, which can lead to a predictable sequence of a painful deformity resulting in articular degeneration." "Most authors agree that both acute and chronic grade 3 RCL tears should be surgically treated." Id.

101. Plaintiff Kyles has offered medical evidence stated above showing that he was delayed and denied proper treatment for his left thumb injury.


C.   EXHAUSTION OF LEGAL REMEDIES

1.   Plaintiff Kyles filed grievances concerning the facts relating to this Complaint.

2.   The first grievance (SCI-2016-19506) was dismissed at every level. See, Ex. H.

3.   Relating to one issue, Kyles filed three grievances. Two were not accepted. See, Ex. L & R. The other grievance (SCI-2016-22497) was rejected at every level. See, Ex. T.

4.   The final grievance (SCI-2016-28160) was dismissed at every level. See, Ex. Z.

5.   Plaintiff Kyles has exhausted all administrative remedies under 42 USC § 1997e(a) and Wis. Adm. Code Chapter 310.

6.   Assuming the Court take jurisdiction of Kyles' state tort claims. A Notice of Claim was timely filed on each grievance. See, Ex. H, T, and Z.


D.   LEGAL CLAIMS

1.   Defendants Nurse L. Krizan and Nurse Jane Doe exhibited deliberate indifference toward Plaintiff Kyles severe thumb injury in violation of the Eighth Amendment, when Krizan and Jane Doe knew or recklessly failed to know that Kyles symptoms warranted referral to a doctor to determine the cause of his aching and constant pain. See, ¶¶1-7, and 18-21. Because Krizan and Jane Doe chose to put a band-aid on Kyles symptoms, he was in unnecessary prolonged pain for 85-days before receiving necessary treatment-Left Thumb Radial Collateral Ligament Repair Surgery. See, ¶22.

-12-

2. Defendant Nurse R. Anderson exhibited deliberate indifference toward Plaintiff Kyles severe thumb injury in violation of the Eighth Amendment, when Anderson had actual knowledge of Kyles painful discomfort, yet failed to provide pain medication (ibuprofen). Kyles was forced to wait 14-days in constant pain before being provided ibuprofen for his thumb pain. See, ¶¶11-14.

3. Defendant CO II, R. Stuve exhibited deliberate indifference toward Plaintiff Kyles severe thumb condition in violation of the Eighth Amendment, when Stuve failed to defer to medical personnel before refusing to provide prescribed pain medication (Vicodin) knowing Kyles was in pain. See, ¶¶28-37, 41-45, and 52. Kyles was forced to wait nearly two hours with severe pain before being provided prescribed Vicodin for his two-day-old RCL repair surgery, and waiting every six hours days after due to Stuve's interference with prescribed treatment.

4. Defendant HSM, ' J. Barker and HSU Liaison Capt. Lundmark exhibited deliberate indifference toward Plaintiff Kyles severe thumb condition in violation of the Eighth Amendment, when Barker and Lundmark obtained actual knowledge, via informal requests of Kyles painful medical condition and inadequate medical care, yet still failed to exercise their authority to intervene on his behalf to prevent Defendant Stuve's arbitrary conduct from recurring. Barker and Lundmark turned a blind eye. See, ¶¶38,40,49, 50,51, and 53.

5. Defendant Jane or John Doe exhibited deliberate indifference toward Plaintiff Kyles severe thumb condition in violation of the Eighth Amendment, when she/he ordered physical therapy but failed to follow through with having Kyles chart flagged so he could be scheduled for a physical therapy appointment after surgery compromise his results. See, ¶¶58-62, 65-66. Kyles was forced to wait 33-days before physical therapy treatment was provided which caused the lost of some flexion at the non-operative left thumb joint. See, ¶¶67-74.

### E.   VENUE AND JURISDICTION

1. Venue is proper in the Western District of Wisconsin under 42 USC §1391 because the substantial amount of acts and omissions giving rise to Kyles claims occurred at Stanley Correctional Institution in Chippewa County, located in the Western District.

2. This Court has jurisdiction under 28 USC §§1331, 1343(a)(3) and 1367(a).

3. This Complaint is brought pursuant to 42 USC §§1983 and 1988 and the Eighth and Fourteenth Amendments of the United States Constitution.

4. The amount in dispute exceeds Ten Thousand ($10,000) dollars.

### F.   RELIEF SOUGHT

   Plaintiff Kyles prays that this Court grants the following relief:

1. Assume jurisdiction of this action on both Federal and State Law Claims.

2. Issue a declaratory judgment stating that: All Defendants stated herein violated Kyles rights under the Eighth Amendment of the United States Constitution by delaying and denying medical treatment and for his serious medical needs.

3. Award compensatory damages to Kyles in the amount of $1,000,000 against each Defendant jointly and severally for oppression, past and future pain, physical deformity, and psychological anguish in violation of the Eighth Amendment under the United States Constitution and 42 USC §1983.

4. Award exemplary damages to Kyles in the following amounts to punish each defendant for acting with wanton, reckless, and callous indifference, ill will and malice in regards to Kyles' right under the Eighth Amendment and 42 USC §1983:

   a. $100,000 against defendant Krizan

   b. $100,000 against defendant Jane Doe

   c. $25,000 against defendant Anderson

   d. $25,000 against defendant Stuve

   e. $25,000 against defendant Barker

   f. $25,000 against defendant Lundmark

   g. $100,000 against defendant Jane/John Doe

5. Award Kyles cost of the suit, reasonable attorney fees, and any relief the Court deems proper. Cost of the suit shall include the cost of all photocopies and postage paid for filing of Inmate Complaints, Appeals photocopies, postage paid relating to this suit and filing fees. Cost should also include typing materials such as cassette ribbons and correction tape.


I certify and declare under penalty of perjury pursuant to 28 USC §1746 that the forgoing is true and correct from my personal observation, medical reports written by defendants or other health professionals.

Complaint signed this **7** day of **March**, 20**17**.

Lorenzo Kyles #388908
Stanley Corr. Inst.
100 Corrections Drive
Stanley, WI. 54768-6500


**REQUEST TO PROCEED IN DISTRICT COURT WITHOUT PREPAYING THE FILING FEE**

I DO request that I be allowed to file this complaint without paying the filing fee. I have completed a request to proceed in the district court without prepaying the fee and attached it to the complaint.